No. 789

First Circuit

——

THOMPSON v. FUTRAL

——

(October 7, 1931. Opinion and Decree.)
(December 8, 1931. Rehearing Refused.)
(January 4, 1932. Writs of Certiorari and Review Refused by Supreme Court.)

——

A. H. Garland, R. Lee Garland and M. H. Thompson, of Opelousas, attorneys for plaintiff, appellant.

L. L. Perrault, of Opelousas, attorney for defendant, appellee.

LeBLANC, J. Plaintiff, by his pleadings, attempted to make this an action in boundary, apprehending probably that any other form he might bring would be met with a plea of prescription which could not be pleaded against a boundary suit.

In his petition, he sets out his and the defendant's respective titles to lands which he alleges are contiguous and between which the boundary line has never been "legally" established. He avers that their titles are derived from a common author who originally owned a tract of land containing 66⅔ arpents, the defendant's title calling for 26⅔ arpents, described as having a width of 1⅓ arpents on Bayou Courtableau by a depth of 16 arpents, and his title calling for 36 acres adjoining the other on the south. Immediately following his averment that the line between the two properties has never been legally established is the further allegation by plaintiff "* * * that the fence which the said Sam W. Futral (defendant) has placed on the property takes in about three and eleven hundredths (3 & 11/100) acres of petitioner's property."

An exception of no cause of action was filed in the lower court and overruled, the court holding, however, that the suit, although brought as an action in boundary, was in reality one to recover land which plaintiff claimed belonged to him, but was in the possession of the defendant. Accordingly, the court gave the defendant the right to set up any title he may have and defend on his possession.

Plaintiff's allegation that the defendant had 3.11 acres of his land under fence was a claim that the land was included in his title and belonged to him, and at the same time an admission that it was in defendant's possession. The only result the suit could accomplish would be to establish either in his favor, or adversely, the title to the property he claims, thus making the action petitory in its nature. It would seem, therefore, that by these judicial declarations by which he is bound plaintiff is precluded from doing the very thing he started out to do; namely, to forestall a plea of prescription.

The district judge relied on the case of Ganucheau v. Monnot, 130 La. 463, 58 So. 150, for his ruling that the action here was one involving title and consequently petitory. His ruling to that effect and further permitting the defendant to set up any title he may have and to stand on his possession was correct, and we already maintain it.

In his answer, the defendant sets up the deed under which he claims the property, the same being included in a larger tract of land containing 66⅔ arpents, less about 2 arpents sold to the Colorado Southern, New Orleans & Pacific Railroad Company,

which he purchased from Mrs. Marie Louise Iahaye, wife of Louis Saucier, on February 27, 1911. He pleaded the prescription of ten and thirty years acquirendi causa and also the prescription of thirty years under article 852 of the Revised Civil Code.

From a judgment sustaining the plea of prescription of ten years acquirendi causa and that of thirty years under article 852 of R. C. C., and dismissing his suit, the plaintiff has appealed.

In order to consider the pleas urged by defendant, it is necessary to go back to the origin of the titles to these respective tracts of land.

In the year 1870, a tract of land having a front of 5 arpents on Bayou Courtableau by 40 arpents in depth belonged jointly to L. E. Melancon, J. D. Bernard, and Jean Castille. On November 6th of that year they appeared before a notary public and made an amicable partition of same. The tract was divided into three lots of 1⅓ arpents each on Bayou Courtableau by a depth of 40 arpents. Lot No. 1, the most western one, was allotted to Castille, lot No. 2, the middle one, to Bernard, and No. 3, the eastern one, to Melancon. Each one of these lots contained an area of 66⅔ arpents. Plaintiff's title to the tract of land which he claims is derived through sales to various purchasers, from the tract referred to in the aforementioned partition as lot No. 2, which was allotted to Bernard. His immediate vendor was the estate of Henry L. Garland. The deed under which he purchased was a public sale of the properties of that estate made by A. Leon Dupre, testamentary executor, on September 27, 1919, in which it appears that the tract is described as being 36 acres of land, and the northern boundary given is Mrs. Louisa Sonnier. It is observed that the judgment of court which ordered the partition described the tract as containing only 26 acres. In the adjudication sale, however, the land is referred to as being the same as was acquired from J. H. Bernard et al. on January 17, 1906, and consulting that sale we find that it is there described as containing 36 acres. Regardless for the time being of what the exact acreage was, it is established that the tract constituted the rear or southern portion of the original 66⅔ arpents of the J. D. Bernard lot, immediately adjoining the front portion, which at one time belonged to Mrs. Marie Louise Saucier, who sold to the defendant Futral.

Futral's deed from Mrs. Saucier, as we have already noted, called for a tract of 66⅔ arpents, more fully described as follows:

"A certain tract of land, situated in the Parish of St. Landry, State of Louisiana, with all the buildings and improvements thereon, containing sixty-six and two-thirds (66⅔) arpents, less about two (2) arpents sold to the Col. S., N. O. & P. R. Co., bounded north by Bayou Courtableau, south by lands of Mrs. N. C. Devilliers and Estate of H. L. Garland, east by G. M. Duplechain, and west by Theophile Joansonne. Being the same property acquired by vendor herein from Mrs. Andrew Johnson, as per act of sale dated October 23rd, 1906, and recorded in Conveyance Book B-4½, page 379, of the Recorder's Office of this Parish. The above described property is located in Sec. 20, T—6—S, R—5—E, Louisiana Meridian, being Lots One (1) and Two (2) on a map attached hereto and shaded yellow on said map, the area being erroneously stated on said map to be fifty (50) arpents."

There is no doubt that the tract includes as its western portion that part of the

688

original Bernard lot immediately adjoining the Henry L. Garland (now plaintiff) tract on the north. The eastern portion of the tract we can trace through several conveyances to the original lot allotted to L. E. Melancon in the partition of November 6, 1870. Looking to the deed from Bernard to one Zeringue, made in 1872, and in which the title to the western portion of defendant's tract originated, we find the property described as having a front of one and one-third arpents by a depth of only 16 arpents. This would give an area of 26⅔ arpents. Taking into consideration the area and the boundaries of the eastern portion of defendant's tract of land which comes from the Melancon title, it had the same dimensions, giving both tracts a depth of 16 arpents instead of 20. The defendant contends that 20 arpents is the depth called for in his deed and of which amount of land he has been in possession and had prescribed under the pleas set up by him.

If the defendant had to rely on the titles alone, he would be restricted to a depth of 16 arpents, as up to the time of his deed from Mrs. Marie Louise Saucier that is all that the title called for. But, when she sold to him, she described the land as containing 66⅔ arpents, less the 2 arpents which had been sold to the railroad company for a right of way. It is clearly shown, as already stated, that the 66⅔ arpents consisted of two tracts which measured 1⅔ arpents front each on Bayou Courtableau, making the whole 3⅓ arpents. Now, 3⅓ arpents by 16 would only produce an area of 53⅓ arpents, whereas the same width by 20 arpents would give 66⅔ arpents, the exact number called for in defendant's deed. Moreover, the railroad, right of way mentioned in the deed is shown to be further back than the 16-arpent line, and exactly at the 20-arpent

line from Bayou Courtableau there is shown to have existed a well marked and defined line. The defendant therefore has a deed which we have concluded includes the land up to this 20-arpent line, and, if he has shown possession in good faith for ten years or more, as the district judge held he had, necessarily his plea of ten years' prescription is good, and was properly sustained.

On the question of possession and good faith, we have decided to adopt the views and the findings of the trial judge, who in a written opinion submitted by him has carefully gone over the facts and the law. That part of which is pertinent follows:

"Defendant was until 1911, after his purchase, a resident of the parish of St. Mary, and a stranger in this parish. He was a timber worker and farmer. Before closing his purchase with Mrs. Saucier, the lines of the property he contemplated acquiring were exhibited to him by Louis Saucier, the vendor's husband. The northern part of the Saucier property was under fence and in cultivation and had been for many years, but that part of the same lying on both sides of the Colorado Southern, New Orleans & Pacific Railroad Company's right of way (which had been granted by Saucier to the railroad company some years before) lying south of about the 12 arpent line was unfenced woodland, the lines of which, however, were well marked by surveyor's hacks on trees. The southern line, as shown the defendant by Saucier, was marked at its western end (the southwest corner of the tract) by a cypress post planted in the ground and by cross marks on trees, and followed plain surveyor's marks on trees to the southeast corner of the tract, which was also well marked. This line, then an old one according to the witnesses, is located, according to V. E. Smith, civil engineer, who surveyed the land for defendant, exactly 20 arpents from the bayou and inclosed a tract of 66⅔ arpents, precisely the quantum purchased by defendant.

"Defendant, upon his conclusion to purchase, required Mrs. Saucier to provide him with an abstract of title, which, together with the act of sale which had been prepared by Mrs. Saucier's attorney, he sent to Mr. C. F. Borah, an attorney at Franklin, for examination, who fully approved of the title and of defendant's purchase.

"The plat referred to in the sale as being attached to it was either not actually attached or was lost, for it was not recorded. However, attached to the abstract which defendant produced at the trial was a map or sketch closely fitting the description of the map referred to in the sale. It shows the property shaded in yellow, and shows, moreover, that it extends south of the railroad to the 20-arpent mark, as does the map made by the railroad when the tracks were laid in 1907.

"Immediately after defendant's purchase, he extended his fences southward to the railroad right of way, constructed a hog-proof fence all around the property (with the exception of the small portion lying south of the railroad which was too low to cultivate), built a large residence on the property (which he has since occupied as a home for himself and his family), and cleared and put into cultivation all of the wooded portion of the property north of the railroad. When this suit was brought, he had been in actual, peaceable, and continuous possession for almost 20 years. Hence, if the possession commenced in good faith, defendant has prescribed for all the land covered by his act of purchase.

"An examination of the act under which defendant holds shows that the same was made with full warranty of title; that defendant paid about $30 per arpent for the land, a good price; that it is free of any defects on its face; that it describes and covers the land in controversy. It is a just title. True, it says that the land is the same as that acquired by Mrs. Saucier from Mrs. Andrew Johnson, and scrutiny of that deed would have revealed that Mrs. Johnson sold only to a depth of 16 arpents. But under repeated decisions of the courts it is held that mere reference to another act, the deed of purchase being on its face free of defects, will not affect the purchaser with knowledge and make him a possessor in bad faith. As was said in the recent and valuable case of Land Development Co. v. Schulz, 169 La. 1 (124 So. 125, 127):

"'"A title defective in form cannot be the basis of prescription." By this the law means "a title on the face of which some defect appears, and not one that may prove defective by circumstances, or evidence dehors the instrument."'

"See, also, Pattison v. Maloney, 38 La. Ann. 887; Clayton v. Rickerson, 160 La. 771 (107 So. 569); Montgomery v. Whitfield, 41 La. Ann. 653 (6 So. 224); Beard v. Lufriu, 46 La. Ann. 882 (15 So. 207); Blair v. Dwyer, 110 La. 337 (34 So. 464).

"Futral must have believed his vendor owned the land which he bought, or otherwise he would not have expended shortly after his acquisition a large amount of money in improving it. Had he known of the defects, he surely would not have taken the pains and incurred the expense of having the title examined by a lawyer to ascertain whether he could safely buy. In Land Development Co. v. Schulz, already cited, the court answers plaintiff's contention as follows:

"'There is no doubt that Mrs. Schulz believed that she was acquiring a good title to the lots. * * * She was so advised by an attorney at law before she bought the property, and she showed her faith in his advice by spending a considerable sum of money in improving the property long before she could have relied upon a plea of prescription or statute of repose.'

"While there is no evidence that the south line of the property, marked on the trees in the manner already referred to, was ever formally agreed to as the correct boundary between the proprietors to the north and those to the south, it is clear that it is a surveyor's line, and has been there for considerably more than 30 years. Mr. Camille, who owns property east of Futral's land testified that John Close, who owned the Futral property from 1896 to 1899 recognized it as his south line and exhibited it to him. Louis Saucier, whose wife sold to Futral, testified that it was regarded by him and the other proprietors

as the line and that he thought his wife owned all the land between it and the bayou. He further stated that, when his wife purchased from T. C. Devillier, T. C. Devillier's father, who had charge of the land for his son, showed him the same line. T. C. Devillier testified that he claimed a depth of only 16 arpents, but admitted he had never been to his back line, since he had no occasion to do so. He further admitted that his father, who farmed the property, knew much more about it than he did. Both Morgan and Smith testified that the line was a very old one, as did Theophile Johnson, who formerly owned the property to the west. There are no other lines to be found running east and west across the property, and this fact, taken in connection with the testimony of the witnesses, affords strong proof that it was generally regarded as the boundary between the two properties. Such a line was deemed sufficient in Vidrine v. Vidrine, 14 La. App., 484 (130 So. 244)."

The foregoing reasons correctly dispose of the plea of ten years' prescription. We consider it sufficient to sustain the judgment in favor of the defendant without the necessity of having to discuss the plea of thirty years' prescription under article 852, R. C. C.

We note that the lower court condemned the defendant to pay costs of court. No reason is given for doing so, and we can think of none, unless it was done inadvertently. We deem it our duty to change that part of the judgment so as to make it conform to the law which provides that in every case the costs shall be paid by the party cast. Code of Practice, arts. 157 and 549.

For the foregoing reasons, it is therefore ordered that the judgment of the lower court be amended by condemning the plaintiff, instead of the defendant, to pay the costs, and, as thus amended, that it be affirmed.